JS 44 (Rev. 03/24)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

John West & Lauren Johnson

**(b)** County of Residence of First Listed Plaintiff     Lee
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Brett Adair, Adair Law Firm, LLC, 1200 Corporate Drive, Suite 107, Birmingham, AL 25242

## DEFENDANTS

Lee Enterprises Incorporated dba Opelika-Auburn News
4600 East 53d Street Davenport, Iowa 52807

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | | |
|---|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 | Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 | Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | ☐ 820 Copyrights | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | | | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 840 Trademark | ☐ 460 Deportation |
| | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate Sentence | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 550 Civil Rights | ☐ 465 Other Immigration Actions | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 2000e, 42 U.S.C. § 12117, and 42 U.S.C. 1981a.

Brief description of cause:
ADA failure to engage in interactive process or reasonably accommodate and retaliation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE
01/13/2025

SIGNATURE OF ATTORNEY OF RECORD
*[signature]*

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOHN WEST & LAUREN JOHNSON,** | **)** | |
| | **)** | |
| *Plaintiffs*, | **)** | |
| | **)** | |
| v. | **)** | **Case No.    3:25-cv-48** |
| | **)** | |
| **LEE ENTERPRISES,** | **)** | |
| **INCORPORATED d/b/a OPELIKA-** | **)** | |
| **AUBURN NEWS,** | **)** | |
| | **)** | |
| *Defendant*. | **)** | |

## COMPLAINT

Plaintiffs, John West and Lauren Johnson, by and through counsel, complain of Defendant, Lee Enterprises, Incorporated ("Lee" or "Defendant"), d/b/a Opelika-Auburn News, as follows:

### NATURE OF THE ACTION

1.     This is an action for compensatory and punitive damages based on Defendant's discriminatory treatment of religion in violation of Title VII of the Civil Rights Act of 1964; Defendant refused to engage in a reasonable interactive process and/or reasonably accommodate Plaintiff's objectively held religious beliefs and, instead, in retaliation, fired both Plaintiffs on September 8, within minutes of one another, for refusing to write a pro-transgender news story.

2.     Plaintiffs move this Court for relief on the grounds that they have been

1

and will continue to be harmed irreparably by loss of employment and professional standing.

## JURISDICTION AND VENUE

*3.* This action arises under federal statutory laws, namely, 42 U.S.C. § 2000e, *et seq*.

4. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343, and 28 U.S.C. §§ 2201 and 2202.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because the Defendant owns and operates a newspaper in this District where it employed each Plaintiff, the Plaintiffs reside in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

6. This Court is authorized to grant Plaintiffs' prayer for damages pursuant to 42 U.S.C. § 2000e-5, 42 U.S.C. § 12117, and 42 U.S.C. 1981a.

7. This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, pursuant to 42 U.S.C. § 1988 and 42 U.S.C. § 2000e-5.

## ADMINISTRATIVE REMEDIES

8. Defendant terminated the Plaintiffs on September 8, 2023.

9. Plaintiffs each filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") within 180 days of

September 8, 2023. (collectively attached **Exhibit A**).

10.     Each plaintiff received a Dismissal and Notie of Rights from the EEOC. (collectively attached as **Exhibit B**).

11.     Plaintiffs are filing this action within ninety (90) days of receiving their Dismissal and Notice of Rights form the EEOC.

12.     Plaintiffs have satisfied all conditions precedent to the institution of this lawsuit.

## THE PARTIES

13.     Plaintiffs are adult residents of the State of Alabama.

14.     Lee Enterprises d/b/a Opelika-Auburn News ("Lee Enterprises") employed Plaintiffs as reporters.

15.     Lee Enterprises owns and operates a media outlet that does business in Lee County, Alabama.

16.     Lee Enterprises employed fifteen or more employees for twenty calendar weeks out of the year during the Plaintiffs' employment.

17.     Lee Enterprises employs hundreds of employees nationwide.

18.     Lee Enterprises is an employer for the purposes of Title VII.

### John West

19.     Plaintiff John West ("West") is a biological male.

3

20.     West is a practicing Christian.

21.     West holds the good-faith and genuine belief that he should follow Biblical teachings and practices.

22.     Among West's genuinely held religious beliefs is that God created individuals, and that individuals should live their life in conformity with the way in which God created them.

23.     West holds a genuine religious belief that a transgender lifestyle conflicts with Biblical principles.

24.     West worked for Defendant from June 2022 until he was terminated on September 8, 2023.

25.     In 2006 West decided, after a lifetime of struggling with gender issues, that he needed to transition and begin living full time as a woman. West had coped with thoughts and feelings of being female since he was four years old. West was agnostic at the time and searching for God. West had been given some theologically false information spinning transgenderism as positive in Christianity. He began thinking that God had created him to be a transgender woman. West went to Columbus, GA to buy a new woman's wardrobe and instead found himself led to enter a Christian bookstore. That's where West met God for the first time and the Holy Spirit poured over West as he stepped into the bible section. West knew immediately he was in the presence of God. West pulled a bible off the shelf and opened it. This bible

4

happened to be the English Standard Version and West landed in Job 38.

26.    Beginning with verse 1, the ESV says "Then the LORD answered Job out of the whirlwind and said: 'Who is this that darkens counsel by words without knowledge? Dress for action like a man; I will question you, and you make it known to me.'"

27.    Between this scripture and the prodding of the Holy Spirit, West knew immediately God did not create him to be a transgender woman. Rather, God created West as a man, and it was His desire for West to live as a man. West decided in that moment to repent and follow Christ.

28.    West adheres to Genesis 1:27 and 2:23-24 which confirms God's creation of a gender binary of male and female created in His image. Jesus Christ also confirms this in Matthew 19:4-6. Here he quotes the Genesis scriptures in a discussion with his disciples on marriage. Additionally, Ephesians 2:10, Isaiah 45:9-12, Jerimiah 1:5, and Psalm 139:16 all confirm God knew us before we were born and has a specific plan for our lives. God created West male for His purpose. For West to transition to female would take him away from that purpose. West believes for anyone to transition would be to turn their backs on God's good plan for their lives. West also believes that Jesus died on the cross for all people, including those who have transitioned to the opposite sex. However, for West to affirm transitioning would be to affirm a lifestyle West believes is sinful and require him to turn his back

5

on God's call.

29.    As part of his conversion to Christianity, West came to believe that God created him as a male, that sex is immutable, and that asserting a female identity is against God's will and impermissible for him as a Christian.

30.    Since his conversion, West has done his best to avoid falling into the temptations associated with his former transgender lifestyle. Part of his sincerely held religious belief is that he should avoid knowingly putting himself in situations that will involve significant temptation.

31.    West was hired as a general news reporter by Dimon Kendrick-Holmes in June 2022.

32.    Before going to work for O-A News, West had spent the previous two years freelancing for a handful of local newspapers while he finished earning a bachelor's degree from Columbus State University. Kendrick-Holmes and West discussed West's Christian faith periodically.

33.    West worked as a reporter for Defendant and received positive feedback.

34.    As a reporter, West has successfully covered newsworthy events and people throughout the Auburn-Opelika community, including stories involving people who identify as transgender. This included covering an Auburn City Council candidate who identified as gender fluid and transgender. That story can be read online: Three candidates vie for Steven Dixon's Ward 5 seat on Auburn City Council.

6

35.    It also included covering a pro-transgender activist group who has protested in downtown Auburn since George Floyd was killed. That story can be read here: Toomer's Corner sit-in still going after 1000 days of protest, will celebrate with food drive this Saturday

36.    After Kendrick-Holmes left O-A News, West also wrote a story on the debate over LGBT books in the children's section at the Auburn City Library. That story was ultimately turned down by the interim editor, Justin Lee, because it was based on the public comments section at the Auburn city council meeting.

37.    West wrote all of these from a neutral perspective as a journalist. He let the people he was covering on both sides tell their stories. It is important to note these were not enterprise stories investigative stories. West did not have to do in-depth investigation and develop sources to write these articles. There was no agenda behind these stories. West simply reported the facts of what was going on in the community in those moments rather than acting as an activist.

38.    Sarah Robinson ("Robinson") became managing editor at O-A News in March 2023.

39.    This was her first time as a managing editor, so West was willing to give her grace as she got her feet underneath her and learned the position and her staff. Robinson is a seasoned crime reporter and West was ready to learn from her.

40.    However, at the beginning of June 2023 Robinson told the staff to come to

their weekly pitch meeting with enterprise article suggestions for Juneteenth and Pride month. Robinson believes reporters have an obligation to represent marginalized communities.

41.    In an email that Robinson sent to West on June 5, Robinson reiterated to West to bring story ideas for Juneteenth and Pride Month to the pitch meeting that Robinson and West were scheduled to have a weekly one-on-one meeting the day after the staff pitch meeting.

42.    After the pitch meeting was over,  West told Robinson that he had something he needed to talk to her about and would like to talk to her about it during their one-on-one meeting  Robinson didn't use the words "Pro-LGBT" to describe the articles she wanted. Instead, her position was seen by the angle in which she wanted the stories reported. Later comments on how transgender books are good for kids is a prime example.

43.    During their one-on-one meeting the next day, West told Robinson his testimony about being a former transgender saved by Christ and asked her to not ask him to write pro-LGBT stories.

44.    West told Robinson that he did not need to be put in a place where LGBT ideology was being forced on him. He told her that he had turned from the lifestyle due to his religious convictions.

45.    Robinson resisted his request saying it would be like someone asking not to

8

write stories about the black population.

46. Robinson told West this was "the direction the paper was going in" and that he would have to do it.

47. West told Robinson he was fine with the paper's new direction, but he could not be the one to write biased articles in favor of the LGBT community. He didn't need to be put in a position where he would be tempted to go back to his old life. West told Robinson that he would gladly work with her on any race-related articles she needed, but that he could not write pro-LGBT stories.

48. During this meeting, Robinson told West she would not force West to write enterprise articles on the topic and mentioned he would still need to cover anything going on in the local community.

49. After that one-on-one meeting, West noticed that Robinson became easily agitated with him. She began having more and more problems with his articles. She began regularly making substantial revisions to his articles whereas she had not done this before.

50. A few weeks later, after Pride Month was over, Robinson brought up the LGBT subject again in another one-on-one meeting with West.

51. Robinson told West he would have to cover these stories. She then asked West what he would do if she gave him a LGBT story to write that day. She did not specify the scope of the story beyond the LGBT subject. This led West to think she was

9

testing him. West asked her if she was going to make such an assignment and she responded that "we will see what happens down the road."

52.     Around the last week in August Robinson mentioned how city council members in other parts of the state were taking up issues with LGBT books in the children's sections of their local libraries. Robinson wanted West to see if the city council in Auburn had similar issues. West told her the library in Auburn had LGBT books in the children's section and there had been an ongoing debate among the public about them. Most of the city council didn't have an issue with the books. West also mentioned his previous story on the subject which Justin Lee had turned down.

53.     A few days later, Robinson changed the premise of the story she wanted.

54.     On August 29 she sent an email to West asking for an enterprise story on transgender books in the children's section of the Auburn public library with a specific viewpoint: She wanted West to write that it was good for the transgender community and for kids for the library to carry books promoting a transgender lifestyle. She wanted to know how long the books had been in the library. If they were recently added she wanted to know what took so long for the library to get them. She wanted West to reach out to local LGBT groups to get their take as well.

55.     Robinson never mentioned reaching out to anyone or reporting on anyone with a dissenting perspective on the topic.

56.     Robinson wanted West to write a biased article that would be pro-LGBT instead of taking a neutral route outlining both sides of the topic.

57.     Robinson gave West a deadline of September 6 for the story. (See **Exhibit C** –8/29  Email from Robinson Johnston to West).

58.     West and Robinson spoke on the phone about the story the next day, August 30.  What began as an editing discussion about another article eventually turned to a discussion about the transgender books story she had assigned West.

59.     When West told Robinson he could not write the article in the specific manner she requested, she asked him why.

60.     West told her morally and as a matter of faith he could not write the article she wanted.

61.     West also told her that he did not agree with her premise, and she was not starting from a neutral point of view.

62.     Robinson responded to West that he was letting his opinion get in the way of facts.

63.     Robinson further said journalists had an "obligation" to "represent marginalized communities."

64.     West shared his testimony once again with her and told her that he would not let her personal politics take him back to what God called him out of.

65.     Robinson dismissed West and hung up.

11

66.    Robinson then sent an email on August 30 which would have required West to write the story despite his objections on the basis of religion.

67.    Her email stated that she expected West to have the story finished by end of day September 6. (See **Exhibit D** – 8/30 Robinson Johnson email to West).

68.    Based on West's religious beliefs, he could not write the story she required.

69.    Friday September 8 was a full day at work. West was scheduled to begin a vacation the following Tuesday where he would lead a Christian mission trip to Japan.

70.    West was trying to get several articles finished that would run while he was out of the country. This was in addition to an article about an event he had covered that morning.

71.    West was working from home that afternoon when Robinson called. She told West to come into the office at 4:00 pm for a meeting and directed him to bring his laptop.

72.    As directed, West went to the news office.

73.    West saw Robinson and Lauren Johnson in the staff meeting room and felt he needed to wait until Robinson finished with her meeting with Lauren.

74.    West went back up front, spoke briefly to Tonya Balaam-Reed, and continued editing one of his stories. A few minutes later, Robinson and Lauren came out of the office. Lauren was visibly upset. She grabbed her personal items from her desk.

12

Robinson then escorted Lauren out the front door.

75.     Robinson then told West to come back to the staff meeting room and to bring his laptop.

76.     Once in the office, Robinson told West she had Angela Springer from corporate human resources on speaker phone.

77.     Robinson told West that he was looking to steer around coverage of LGBT groups.

78.     Robinson said she felt that the paper was no longer a good fit for West because he wasn't being objective.

79.     This is a false accusation and that Robinson herself was not being objective with the subject she wanted covered.

80.     Robinson was using objectivity as a pretense to fire him on the basis of his religion.

81.     Robinson said she wanted to help West "transition into an employment situation that would be better for [him]."

82.     Springer then stated she would email severance paperwork to West.

83.     West was then escorted out of the building by Robinson.

84.     Lauren Johnson texted West that afternoon to tell him that she had been fired because she had asked for a religious accommodation regarding LGBT stories.

85.     West told Lauren that he had been fired as well.

13

86.     West did not know until the week he and Lauren were fired that they both had requested a religious accommodation from Robinson regarding their Christian faith by asking to not be required to write pro-LGBT stories.

87.     West and Johnson were both fired late on Friday September 8 in back-to-back surprise meetings with Robinson and corporate Human Resources.

88.     Because West stood up for his faith and did not write the biased pro-LGBT story, he was fired on Friday September 8 in violation of Title VII.

## Lauren Johnson

89.     Lauren Johnson worked for Defendant from September 2021 until she was terminated on September 8, 2023.

90.     West is a practicing Christian.

91.     West holds the good-faith and genuine belief that he should follow Biblical teachings and practices.

92.     Among West's genuinely held religious beliefs is that God created individuals, and that individuals should live their life in conformity with the way in which God created them.

93.     West holds a genuine religious belief that a transgender lifestyle conflicts with Biblical principles.

94.     She worked as a reporter and received consistently good reviews and positive feedback.

14

95.     Johnson frequently received positive responses from people she wrote about and from people who shared story ideas with her. Many of them sent a text or email to thank her for her work and honest reporting.

96.     In February 2022, Johnson was given an Opelika Police Department challenge coin from Captain Tony Amerson after Johnson wrote the article, "Opelika's first Black female police officer shares her story." The back of the coin read, "For your continued support and extraordinary efforts to bridge the gap between the community and our officers."

97.     On May 14, 2022, after Johnson wrote the article, "Not forgotten: Auburn Gunners host William Buechner Memorial Ride for Auburn police officer who made the ultimate sacrifice," Johnson received a test message from Ruben Garza the president of the Auburn Gunners Law Enforcement Motorcycle Club. Garza said, "Great article awesome job by the way. And we appreciate you so much for this. Thank you!" A few months later, Johnson wrote another article titled, "Auburn Gunners are collecting donations for William Buechner Project Toy Drive." After it was published, Garza sent a text that said, "Very very nice article thank you. We appreciate you support as always, thank you so much Lauren."

98.     On August 4, 2022, Johnson's article, "'It's nothing short of a miracle': Opelika and Auburn firefighters honored for quick work stopping Railroad District fire" was published. Opelika Fire Chief Shane Boyd sent Johnson a text message

that said, "Read your article, that was really good and very accurate. Thank you for the opportunity to share with the community honestly. Well done."

99.    Johnson wrote two stories about the life of Sarah Thomas, a pioneer of sickle cell research who passed away in 2022. After the first article was published on February 6, 2023, Johnson received a text message from Maggie Thomas, the daughter of Sarah Thomas. The message said, "Lauren, Thank you & O-A News for a job well done. The story will be remembered always. God bless." After the second article on July 5, 2023, Thomas sent another text message that said, "Greeting(s) Lauren, you received GREAT REVIEWS on the article. Can you please mail me 3 copies like you did last. (Home address included.) I am forever grateful to you. Thank you (for) being awesome. Maggie."

100.    Since 2021, Johnson had built trust within the community, which allowed her to interview people that other reporters from other news outlets did not get the chance to talk to. After Johnson had worked with Carolyn Morton, president of Samford Community Outreach Group and coordinator for Nonviolent Opelika, on several stories, Morton continued to send Johnson story ideas and help her contact sources. Because of Morton's trust in Johnson, Johnson had the opportunity to interview Shirley "Shunte" Jones, Sherry Wiggins, and several others in the community.

101.    Shirley "Shunte" Jones is the mother of Marsiah Collins, who was a teenager

killed in a shooting in Dadeville in April 2023. After the heartbreaking tragedy, Jones wanted to share her son's story, but she was wary of reporters. Jones agreed to share her story with Johnson. During the interview, Jones said she was only going to talk to Johnson, and she wasn't going to talk to any other reporter. After the interview, Jones sent a text to Johnson that said, "Thank you for sitting down with my husband and I. And thanking the community for all the support. I had to share my son's story."

102.   Sherry Wiggins is the mother of Amore Wiggins who lost custody of her daughter in 2009 to the father Lamar Vickerstaff. Amore's remains were found in Opelika 2012, and after a long investigation, she was finally identified in 2023. After police announced Opelika Jane Doe had been identified and Lamar and Ruth Vickerstaff were arrested, Sherry Wiggins was also brought into the spotlight. Wiggins had a bad experience with a reporter from another news outlet. This experience made Wiggins refuse to talk to any more reporters. Because of Morton's trust and confidence in Johnson, Wiggins agreed to meet with Johnson for an interview. Morton encouraged several other ladies who were victims of gun violence to share their stores with Johnson.

103.   Similarly, Johnson's work encouraged others in the community to continue coming back to her with story ideas. Some of these included, Lee County NAACP presidents Billy Allen and Laticia Smith, East Alabama Arts Director Phillip

17

Preston, East Alabama Health Director of Public Relations John Atkinson, Opelika City representatives like Councilwoman Erica Baker Norris, law enforcement officers, Opelika and Auburn City Schools, and other local citizens.

104.    In 2023, Johnson was given the Lee County Emergency Management Agency challenge coin from Lee County EMA Director Rita Smith to show appreciation for the articles Johnson wrote regarding the EMA from 2021 to 2023.

105.    Johnson has had numerous stories sent to the Associated Press. This means these articles were submitted to major news agencies for potential distribution to other news outlets.

106.    Sarah Robinson became managing editor of O-A News in March 2023.

107.    In May 2023, Johnson covered a story about the Methodist Church split, which was titled, "Auburn-Opelika churches share stance with United Methodist after 193 churches disaffiliate." After it was published, Johnson received several emails from people in the community thanking Johnson for her fair and factual reporting that conveyed both sides of the situation. Methodist churches were deciding to stay or leave the denomination based on their stance on same-sex marriage and the ordination of LGBTQ clergy. Johnson also received an email from both pastors she spoke with – Pastor Matt Mobley of Auburn Cornerstone Church and Pastor Cory Smith of Auburn United Methodist. Mobley's church decided to disaffiliate, and Smith's church decided to remain in the United Methodist

denomination. Sarah Robinson, the editor of the Opelika-Auburn Newspaper at the time, congratulated Johnson on her work on this article and told Johnson that they had received a lot of positive feedback.

108.   In June 2023, Robinson was editing a story Johnson was assigned and had completed before Robinson was hired in March 2023. The story was assigned to Johnson from Lee Enterprises' corporate level. Lee Enterprises asked a reporter from every newspaper they own across the country to write a story about the local police departments to see what changes have been made three years after George Floyd's death. This project involved a lot of data collection and interviews with three different departments. Johnson completed the work by the assigned due date, but for some reason the publishing date was delayed by Lee Enterprises. Robinson was now the editor of the O-A News. After Robinson read Johnson's article, "George Floyd's death spurs officers to build relationships," Robinson called Johnson. Robinson seemed to be upset that the article was somewhat positive. Robinson reprimanded Johnson for not asking certain questions Robinson would have asked. However, Johnson asked every question that was on the list sent by Lee Enterprises. Robinson was clearly angry that the sheriff and police chief said their departments didn't need to make many changes because they already used body cameras and followed state guidelines. The sheriff and police chief told Johnson that Floyd's death spurred them to get involved in the community, build relationships

19

with the community, and listen to the community. Robinson was not satisfied with this and asked Johnson to make the headline stronger. Robinson gave examples that had a negative slant, but she ended up publishing it with the headline Johnson wrote.

109.   During a morning staff meeting on or about June 14, 2023, while talking about stories planned for the week, Robinson introduced a story idea about highlighting, in a positive light, the life of a local transgender person and assigned it to Johnson. Johnson's understanding was that Robinson was asking for an article that would be more than a profile about an individual. Robinson pitched the story idea with the goal of commending a transgender person for their decision and highlighting their bravery to transition. Robinson wanted the article to focus on the transgender's life and the struggles they've faced. Robinson wanted an enterprise feature story that would celebrate the lifestyle of the LGBTQ community during Pride Month. The way Robinson spoke about this story made Johnson feel like Robinson wanted a story that praised the lifestyle of a transgender person.

110.   Robinson did not have a source in mind for the article and said Johnson would need to find someone who would agree to be featured in the article. Johnson struggled with this assignment and reached out to her parents and a seasoned reporter from the Troy Messenger, whom Johnson worked with prior to the O-A News, for guidance. Both Johnson's parents and former coworker encouraged Johnson to have a conversation with Robinson, asking her to give the story to

20

another reporter.

111. Two interns were scheduled to start working at the O-A News in the next few days. Another intern was getting ready to leave. Johnson believed one of those three people would be a better fit to write the story Robinson wanted. Johnson thought Robinson could pull a story from the Associated Press, which was often used by the O-A News when needed. Johnson also believed Robinson could ask one of the writers at the Dothan Eagle or Eufaula Tribune to write what she wanted. Johnson wrote a few articles for the Eufaula Tribune and has had stories published in the Dothan Eagle. As a last resort, Johnson thought Robinson could write this story she was so passionate about since Robinson has experience as a reporter and the previous editor, Dimon Kendrick-Holmes, and the sports editor, Justin Law, frequently wrote stories and editorials.

112. Johnson decided to call Robinson later that day to let her know that Johnson was uncomfortable with writing a story that promotes and encourages the transgender lifestyle. Johnson asked Robinson to please assign the story to one of the interns. Because of Johnson's Christian beliefs, she could not effectively write an article that would celebrate the transgender lifestyle. Johnson also feared that Robinson would include her (Robinson's) biased beliefs in the article. Johnson did not trust Robinson to edit her work without adding an agenda. Johnson had experienced Robinson trying to add her biased beliefs in the article Johnson wrote

21

earlier that looked at what changes police departments made since George Floyd's death.

113. Robinson asked Johnson why she was not comfortable writing the transgender story, and Johnson replied that, as a Christian, it conflicted with Johnson's sincerely-held beliefs about sexual orientation and identity. Johnson reminded Robinson that Johnson was okay with presenting an article like the Methodist Church story Johnson wrote in May 2023 when the denomination had churches leave because of LGBTQ issues. (See above Parag. 107).

114. With that story, Johnson was able to present both sides of the situation and let readers decide for themselves what they thought. Johnson explained that the clear angle Robinson wanted for the transgender story was to promote, commend, and encourage the transgender lifestyle through their life story and struggles. Robinson wanted to promote the transgender lifestyle through a one-sided story that praised one point of view about transgenderism. Johnson told Robinson that being required to write this story with the pro-LGBTQ spin Robinson requested would violate Johnson's sincerely held beliefs as a Christian.

115. Robinson was clearly frustrated and angry. Robinson told Johnson that she was disappointed in Johnson and made several other threatening statements:

- "I'm not threatening your job but…"
- "As a reporter it's our job to highlight minority groups and underrepresented communities."

- "We have to be unbiased and not express our feelings." However, this is in fact, what Robinson was doing. Johnson had witnessed Robinson express her feelings about police, and again, about this pro-LGBTQ story. Robinson was telling Johnson to be unbiased, but Robinson was the one wanting Johnson to write a biased story that included Robinson's strong beliefs.
- "It's about human rights. Trans people have a right to tell their story."
- "People don't typically look at the name of the person who writes the article. It's attached to the company. People should know you had to write it for the company." In Johnson's experience, this was not the case. People in the community recognized the author of the articles that were published. Johnson had people reach out to her because they saw an article she wrote with her name on it.
- "We're at risk of not having a Pride Month story." This was false. The paper published two articles for Pride Month in on June 1 and June 3. One was written by Ansley Franco titled, "2023 Pride Fest: Kameron Michaels to perform in Auburn." The other article was "June is LGBTQ+ Pride Month. Here's what to know." There was also a photo gallery published on June 5 by photographer Adam Sparks titled, "See key moments from the 2023 PrideFest in Auburn."
- "I understand if you're nervous about being discriminated against by certain groups."
- Robinson compared this situation to the Black Lives Matter situation and her experience covering things she didn't agree with revolving around police. Robinson explained that, as an African American woman, she had very strong beliefs and feelings against law enforcement. She gave the example that she couldn't add her bias or personal beliefs into the stories she wrote about police. Robinson said she had to report the facts they gave her.
- Robinson said she doesn't want her reporters to be able to pick and choose what articles they write or for her reporters to deny writing about a marginalized community. Johnson had never turned down a story that her editors had assigned to her. Johnson was not asking Robinson to ignore marginalized groups or to silence marginalized groups. Johnson spoke to Robinson in confidence requesting her to assign the story to another writer who would be able to write what Robinson was looking for. Johnson believed one of the three interns, a reporter from the Dothan Eagle, a reporter from the Eufaula Tribune, or Robinson would have been able to write the story. Johnson also thought Robinson could find a similar story from the Associated Press.

116.  Robinson ended the interaction by telling Johnson that she would send

Johnson a copy of the handbook policy because she did not think it fell under a religious accommodation. After reading the policy, Johnson believed she was protected by the religious accommodation policy.

117.   Robinson did not direct Johnson to write the story ever again, and it appeared she was going to accommodate Johnson's request and let someone else write this story.   Robinson never told Johnson that Johnson's request for an accommodation would lead to retaliation in terms of raises, job standing or termination. Robinson did retaliate against Johnson and ostracized Johnson from that point forward.

118.   Every one-on-one meeting after this conversation (roughly once a week sometimes once every two weeks), Robinson would bring up a raise Johnson was scheduled to receive. Johnson never brought it up and wasn't planning to ask about it until December.

119.   Each meeting Robinson asked Johnson if Johnson had anything else to mention, and Johnson replied, "No." Then Robinson would bring up the promised raise and tell Johnson that she [Robinson] was working on the raise and waiting on corporate. Johnson was made to feel like Robinson was using a raise Johnson needed to try and force Johnson to write the transgender story.

120.   In August, after talking about two stories Johnson was working on, Robinson asked if Johnson had anything else Johnson wanted to bring up. Johnson responded, "No." Robinson again brought up the topic of the raise. Robinson told Johnson that

Robinson never requested the raise for Johnson from corporate for two reasons (even though she'd previously told Johnson that she was working on it and in contact with corporate). The first reason was Robinson's belief Johnson was being "paid enough to at least cover the cost of living" and the second reason was because Johnson refused to write the story in June about a transgendered person.

121.   Robinson shared her vision for the story again, but it was completely different from how she first pitched the story in June. Robinson told Johnson she wanted to have a transgender person talk about the anti-trans laws that were passed in June, and she wanted to have the transgender person talk about their experience, the hate or violence they've experienced, and how they are treated differently because of these laws. This was the first time Johnson had heard any of these added details. All Robinson told Johnson in June was that she wanted a story to highlight someone who made the transition in a way that honored them for their decision and celebrated Pride Month.

122.   Robinson said she didn't ask Johnson to pursue the story again because Robinson was scared about what questions Johnson would have asked in the interview. Robinson said she was afraid Johnson would offend the transgender individual. Robinson claimed she was concerned about Johnson expressing personal views and putting personal bias into that story and other stories. Johnson has proven in past interviews to be polite, professional, and compassionate, especially when

interviewing people who were grieving. Johnson has proven in past articles to be honest and unbiased, writing with a balanced perspective when assigned a story about controversial topics.

123.  Robinson told Johnson that a journalist is supposed to write stories about underrepresented communities and should be able to write about anything no matter what the reporter's personal beliefs are. Because Johnson voiced her beliefs to Robinson and told Robinson that she [Johnson] could not write the pro-transgender story, Robinson said she couldn't rationalize giving Johnson a raise.

124.  Johnson asked Robinson if this was final or, if in the future, there was a chance Johnson would ever get a raise.  Robinson responded no and said she wanted journalists who will write about underrepresented groups.

125.  Johnson reminded Robinson why Johnson had asked for a religious accommodation in June based on Johnson's sincerely-held religious beliefs that conflicted with Robinson's directive to write the article that praised and promoted the transgender lifestyle. Johnson told Robinson that what Johnson could do was write an article about a transgender person that did something in the community - for example - start a business. Johnson told Robinson that she would have no problem writing an article about that, and if it came up that the subject wanted to talk about being transgender, Johnson would include it. Johnson also said she could write an article with balanced perspectives.

126.   Between June and September 2023, Robinson never asked Johnson to write the transgender story again. Robinson never assigned another LGBTQ story to Johnson, and Johnson was not aware of any other potential local LGBTQ story to write about. Johnson did not contact Lee Enterprises Human Resources because she believed she was protected under the religious accommodations outlined in the handbook and because she was not assigned a pro-LGBTQ story after June 2023.

127.   Six months after Johnson made a request that Robinson not force her to violate her religious beliefs by forcing her to write a pro-transgender news story, Defendant terminated Johnson on September 8, 2023.

128.   On September 8, around 3:30 p.m., Johnson was wrapping up a story and getting ready to put it in blox (OA News' system for uploading and publishing stories) when Johnson received a call from Robinson. Robinson asked Johnson, who was working from home, to drive to the office to talk about stories. Johnson responded that she needed to finish putting a suicide awareness article in blox then she would head to the office. Robinson also told Johnson to bring her laptop.

129.   When Johnson walked into the office, only Tonya Balaam-Reed and Robinson were in the office. Robinson was in her private office, and Johnson went over at about 3:50 to let Robinson know she [Johnson] was there.

130.   Several minutes later, Robinson came and asked Johnson to bring her computer to the conference room in the back of the office. Johnson entered the room,

set down her computer, and Robinson said, "I have Angela Springer on the phone from HR."

131.   Robinson stated that because Johnson had refused to write about the LGBTQ community—which was unequivocally not true—that Robinson wanted to help Johnson "transition to other employment." Angela Springer then took over the conversation.

132.   Springer explained some details about severance pay, getting paid for PTO time, and other details. Springer told Johnson to turn everything in today, and as Johnson was leaving, Robinson smiled and said: "Just so you know, it's nothing personal."

133.   Johnson sent a quick text to John West to tell him that she had been fired. West responded that Robinson had just fired him too for the same reason. Johnson did not know until that week that Robinson had ordered West to write some kind of story promoting LGBTQ ideology, and West told Robinson that he could not do it.

134.   After Johnson was fired, she has experienced episodes of breathing problems and pain in her chest. This has affected Johnson's ability to deal with stress and anxiety.

135.   Since Johnson was terminated from the O-A News, she continued to receive messages and phone calls from local contacts. This included Laticia Smith, Oscar Penn, Carolyn Morton, Phillip Preston, Maggie Thomas, Erica Baker Noris, and

others.

136.   Johnson had to inform Becky Brown, Opelika City Schools director of public relations, and Daniel Chesser, Auburn City Schools public relations coordinator, that the story Johnson was working on about both schools would not be published since she was no longer with the newspaper. Brown responded, "I'm so sorry. You always did a great job for us. If you need a reference just let me know." Chesser responded, "I hate to hear this about them letting you go…I hope this unexpected bump in the road opens a door for a new and better opportunity for you. I enjoyed working with you and I appreciate the heads up about the story!"

137.   A defense attorney, David Dawson, messaged Johnson in November 2023 with an update on two stories Johnson had been following, which included a racial discrimination case against Auburn and the Opelika Jane Doe cold case. Dawson was representing the murder suspect Lamar Vickerstaff. Johnson had to tell Dawson that she was fired from the newspaper. Dawson was disappointed to hear this and said, "I had already decided you were the only reporter I was going to discuss Vickerstaff."

## Defendant Lee Enterprises Incorporated

138.   Defendant Lee Enterprises Incorporated is based in Davenport, Iowa.

139.   Lee Enterprises advertises itself as the leading provider of local news, information and advertising in 74 markets in 26 states.

140.   It is publicly traded on NASDAQ and it owns, operates and controls the Opelika-Auburn News (O-A News).

141.   In Alabama, Lee Enterprises also owns, operates and controls the Dothan Eagle Newspaper.

142.   On the Opelika-Auburn News website (www.oanow.com), the "Join Our Team" tab directs a viewer to Lee Enterprises' Job Search webpage (https://us242.dayforcehcm.com/CandidatePortal/en-US/leeenterprises/SITE/CANDIDATEPORTAL) which demonstrates that the company is an integrated enterprise with centralized human resources and hiring structure controlling all of its subsidiary newpapers and outlets.

143.   Lee Enterprises is either an integrated enterprise and the employer of both Plaintiffs as defined by Title VII or it is a joint employer under Title VII with Opelika-Auburn News.

144.   In either case, Defendant has well more than 15 employees and is covered by Title VII.

145.   On the Alabama Secretary of State website, there is no legal entity found under "Opelika-Auburn News"

146.   Plaintiffs received their paychecks from Lee Enterprises through electronic deposit.

147.   Plaintiffs were each terminated by a local manager and the corporate

Human Resources Department of Lee Enterprises who was attending by telephone.

148. Further, Plaintiffs were assigned stories, at times, directly by Lee Enterprises.

## COUNT I
## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### Religious Discrimination - Failure to Accommodate and/or Engage in Interactive Process
### (42 U.S.C. § 2000e)

149.  Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-148 above as if fully set forth herein.

150.  Plaintiffs hold sincere religious beliefs that precluded them from authoring a news article that promoted transgender ideology and beliefs.

151.  Plaintiffs timely informed Defendant of those beliefs and requested a religious accommodation suggesting several alternatives to management.

152.  Defendant refused to engage in the required interactive process with Plaintiffs regarding their religious accommodation requests, failed to reasonably accommodate, and instead terminated each Plaintiff on the same day in September for refusing to write the mandated pro-transgender news article.

153.  Defendant's actions in denying Plaintiffs any interactive dialog to discuss means for accommodating them and by imposing harsh, retaliatory and punitive measures on them such as denials of raises, ostracism and termination violate

31

Plaintiff's Title VII right to exercise of religion.

154.   Defendant failed to provide Plaintiffs with reasonable accommodations for their religious beliefs and thereby discriminated against Plaintiffs because of their religious beliefs.

155.   Defendant's failure to provide religious accommodations has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship to Plaintiffs from violation of their sincerely held religious beliefs and the occupational, professional, social and economic consequences pleaded above.

156.   By failing to engage in the interactive process or offer any reasonable accommodation, Defendant's discriminatory actions were intentional and/or reckless and in violation of Title VII.

157.   Plaintiffs each filed a charge with the EEOC and received a right to sue letter.  Plaintiffs are filing this action within the timeframe permitted under the EEOC right to sue letter.

## COUNT II

## VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### Religious Discrimination - Retaliation
### (42 U.S.C. § 2000e)

158.   Plaintiffs hereby reallege and adopt each and every allegation in paragraphs 1-157 above as if fully set forth herein.

159.  Plaintiffs engaged in protected activity when they requested religious accommodations from Defendant.

160.  Rather than engage in any sort of a reasonable interactive process with Plaintiffs, Defendant's manager ostracized and retaliated against each Plaintiff. For instance, Sarah specifically told Johnson she would not be requesting a raise for Johnson because Johnson had refused to write the transgender story as Sarah directed despite Lauren having objected and asking for accommodation. Ultimately Defendant terminated each Plaintiff on the same day for the same reason – for expressing and maintaining sincerely held religious beliefs. These actions constitute retaliation.

161.  By retaliating and failing to engage in the interactive process or offer any reasonable accommodation, Defendant's actions were intentional and/or reckless and in violation of Title VII.

162.  Plaintiffs' expression of religious beliefs and protected activity were the causes of Defendants' adverse employment action.

163.  By retaliating against Plaintiffs for engaging in protected activity, Defendants have violated Title VII. This violation has caused, is causing, and will continue to cause irreparable harm and actual and undue hardship to Plaintiffs from violation of their sincerely held religious beliefs and the

occupational, professional, social and economic consequences as described above.

164.   Plaintiffs  filed EEOC charges complaining of these retaliatory actions and received a right to sue letter. (**Exhibit A**). Plaintiffs each filed a charge with the EEOC and received a right to sue letter. (**Exhibit B**).  Plaintiffs are filing this action within the timeframe permitted under the EEOC right to sue letter.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs respectfully requests this Court enter a judgment against Defendant under Title VII by which this Court awards:

(1)   Reasonable costs and expenses of this action, including a reasonable attorney's fee, in accordance with 42 U.S.C. § 1988 and other applicable law;

(2)   Compensatory damages to be determined by the trier of fact;

(3)   Punitive damages to be awarded by the trier of fact;

(4)   Awards nominal damages to be determined by the trier of fact;

(5)    Awards injunctive and equitable relief including, but not limited to, training, backpay, reinstatement and/or front pay and modification of each Plaintiff's personnel file;

(6)   Prejudgment and post-judgment interest, as allowed by law; and

(7)    Such other and further relief as the Court deems equitable and just under the circumstances.

## PLAINTIFFS DEMAND A TRIAL BY STRUCK JURY

DATED: January 13, 2025.

Respectfully submitted,

*/s/ Heather Leonard*_____
Heather Newsom Leonard
ASB-1152-061H

OF COUNSEL:
**Heather Leonard, P.C.**
2105 Devereaux Cir., Suite 111
Birmingham, AL 35243
(205) 977-5421
heather@heatherleonardpc.com

*/s/ Brett Adair* _____ __
Brett Adair
ASB-4712-r71r

**Adair Law Firm, LLC**
1200 Corporate Drive, Suite 107
Birmingham, AL 35242
(205) 995-5080
Brett@Adair-law.com

**Attorneys for Plaintiff**

**<u>Summons and complaint to be served by certified mail upon:</u>**

**Lee Enterprises Incorporated d/b/a Opelika-Auburn News**
4600 East 53d Street
Davenport, Iowa 52807


Cc: Kristin E. Michaels, Counsel for Lee Enterprises ([kmichaels@nge.com](mailto:kmichaels@nge.com))